## Case No. 13,919.

### The THOMAS & HENRY v. UNITED STATES.

[1 Brock. 367.]

Circuit Court, D. Virginia.   Nov. Term, 1818.

DEPOSITION—DE BENE ESSE—WAIVER OF OBJECTION—EFFECT OF—PENAL ACTIONS—PRESUMPTIONS—AFFIDAVIT—FORFEITURE.

1. A deposition taken de bene esse, was offered in the district court on behalf of the United States, to which it was objected, "that it was not taken and returned according to law." Held, in the appellate court, that this objection must be considered as applying to it as a deposition in chief, and does not dispense with the necessity of proving those circumstances which would have entitled the attorney for the United States to read it, as a deposition taken de bene esse.

[Cited in Hunter v. International Ry. Imp. Co., 28 Fed. 843.]

2. Where the party, against whom a deposition is taken, expressly waives all objection to it, this general waiver must be understood as extending to the deposition, only in the character in which it was taken, and not as imparting any new character to it, not intended by the party taking it. Thus, where a deposition was taken de bene esse, and the adverse party waived all objection, such a waiver does not make it a deposition in chief.

3. A deposition, taken before the trial, of an informer, who is entitled, under the act of congress, to a portion of a fine, forfeiture, or penalty, is not admissible evidence. The act of congress only makes such an informer a competent witness, when "he shall be necessary as a witness on the trial;" of which necessity, the court must judge after hearing the other testimony.

[Cited in Allen v. Blunt, Case No. 217.]

4. In prosecutions for a violation of the act regulating the collection of duties on imports and tonnage, the United States are not required to prove guilt, but the accused must prove innocence. If, in any case, such a legislative provision can be justified. it is in prosecutions under this act because the violation is generally perpetrated under all the secrecy that ingenuity can devise; and the means of proving innocence, at least to a reasonable extent, which is all that can be required, are in possession of the accused.

5. A claim to a vessel and cargo filed in an admiralty cause, though sworn to, is not evidence. The law does not allow to the affidavit the dignity of testimony. If it amounts to anything, it is to no more than "the exclusion of a conclusion."

6. A party, who offers as evidence in an appellate federal court, a deposition, taken de bene esse, must show, that the requisites of the judicial act have been complied with, viz. that the deponent is dead, out of the United States, or gone to a greater distance than 100 miles, &c., and, unless he does this, the deposition cannot be read.

7. The act of congress, requiring masters of vessels, &c., to make a report of their cargo, &c., does not forfeit the cargo for the omission of any specific article, constituting a part of the cargo, but only the article so omitted. Consequently, it is error in the court below, to render sentence of condemnation, forfeiting a portion of a cargo, unless the libel charges, that that particular portion was omitted in the report.

This cause came up on an appeal from the district court. The schooner Thomas & Henry was libelled in the district court of Norfolk, for acting in violation of the 30th section of the act of congress, passed the 2d of March, 1799, entitled, "An act to regulate the collection of duties on imports and tonnage." 1 Story, Laws, c. 128, § 30, 598 [1 Stat. 649, c. 22]. The libel charges, 1. That the schooner Thomas & Henry arrived from a foreign port, within the United States, and within the jurisdiction of this court, having on board a cargo consisting, principally, of distilled spirits, and that part of the said cargo, of the value, in all places, of more than $400, were unladen and delivered from on board the said schooner without any permit. 2. That the master of the said schooner did not, within forty-eight hours after his arrival, and the arrival of the said schooner, make any report, in writing, to the surveyor, acting as inspector of the revenue, for the port aforesaid, of the facts and circumstances required by law to be so reported The libel concludes by praying that a citation may issue against the Thomas & Henry, her tackle, apparel, and furniture, and her cargo, so far as the same consists of foreign distilled spirits; that the same may be condemned as forfeited to the United States, to be sold by a decree of the court, and the proceeds distributed according to law. Thomas Fletcher filed his claim, setting forth that he was joint owner with H. Parker, of the American schooner Thomas & Henry, and of thirty-four hogsheads of rum, and twenty barrels of limes, now libelled, and demanded the said vessel, her tackle, apparel, furniture, and cargo, to be restored to him. The claimant states, that he, and H. Parker, both native citizens of Virginia, and residents of the county of Accomack, are the owners of the Thomas & Henry, of which vessel. Thomas Fletcher, Jr. is master; that the said vessel, on the fifth day of March, 1811, while lying in the district of Folly-Landing where she had, a few days before, arrived, from the island of St. Bartholomews, with the rum and limes aforesaid, and while the custom-house officers of the United States were actually on board, engaged in gauging and measuring, the cargo was taken possession of by the revenue cutter, and conducted to the port of Norfolk, and there libelled, although "no act had been done, or omitted, on the part of the owners, or master of the said vessel, relative to the laws of the United States, whereby the vessel, or her cargo, became liable to seizure, or forfeiture; that no part of the said cargo" (thirty-four hogsheads, which were seized), "so brought in, was landed prior to the said seizure, but that the whole which was imported, was on board at the time of the seizure." A similar claim was filed by Henry Parker, the other joint owner. In the district court, the deposition of Thomas V. Butler, the mate of the revenue cutter, taken in open court, was introduced by the attorney for the United States. Butler states, that he was ordered by the captain of the cutter, to take posses-

1 [Reported by John W. Brockenbrough, Esq.]

sion of the Thomas & Henry; that he went in a boat into Pungoteague river, where he found the vessel in the act of discharging two hogshead of rum, part of the cargo on deck, with a lighter alongside, and two hogsheads in the slings, and the crew breaking up the cargo in the hold; that he asked the captain of the vessel for his authority for landing his cargo. The captain stated that he had entered his vessel, but upon being asked for his permit to land, he produced none. The deponent further stated that the cutter was sent from the port of Norfolk, by the direction of the collector of the district of Norfolk and Portsmouth, to take possession of the said schooner Thomas & Henry, in consequence of information given by the mate and some of the crew of the said schooner: That at the time he took possession, and made seizure of the said vessel, she had on board thirty-four or thirty-five puncheons of rum, that after taking possession of her, with such cargo as she had on board, he proceeded with her to the port of Norfolk, where she was surrendered by deponent to the marshal. Upon being interrogated by the court, the witness stated, that a part of the cargo had been landed before he took possession of her. Witness was obliged to change the trim of the vessel, she being entirely out of trim. There was a large vacancy midships, occasioned, as he believed, by the removal of a part of the cargo. She was, consequently, too much by the stern.

There was no countervailing evidence introduced by the claimants, in the district court, but at the trial in the circuit court, the depositions of Robert Pitts, George P. Barnes, and William Pitts, taken subsequent to the trial in the district court, were offered. The deposition of Robert Pitts, stated, that he was on board the schooner Thomas & Henry, at the time that the boat from the revenue cutter boarded her and took possession, with intent to assist the inspector, George P. Barnes, in moving and marking the cargo; that it was necessary to move the hogsheads out of the way to get at the cargo, to gauge and mark it, and that there was, at that time, no appearance of any part of the cargo having been removed. George P. Barnes stated, that he was an inspector of the revenue for the district of Folly-Landing, in 1811, and that the schooner Thomas & Henry, Captain Thomas Fletcher, Jr., arrived at Pungoteague, in the port of Folly-Landing, in March, 1811: that immediately after the arrival of the schooner, he went down to Pungoteague, and went on board to inspect her cargo: that while he was on board, and was in the act of inspecting her cargo, and marking the hogsheads of rum, that a boat came alongside with the officer of a revenue cutter, belonging to the United States, commanded by a Captain Hamm: that some desultory conversation took place between the deponent, and the officers of the cutter, and that they either told him, or he was impressed with the belief, that his authority had ceased as an inspector on board the said schooner, and that he left her and returned home. To the best of deponent's recollection, there were about thirty or thirty-five puncheons of rum, and he did not discover any particular deficiency of cargo midships of said schooner, or that there was any breakage of the cargo in the midships. William Pitts was employed on board the Thomas & Henry, to assist in moving the cargo, for the inspection of the custom-house officer; and while he was so employed, in the presence of the custom-house, officer, the said schooner was seized, with her cargo, by Captain Hamm, of the revenue cutter. Witness stated, that the floor of the said schooner was then covered, from main to foremast, with hogsheads of rum, and barrels of limes; and there was no appearance of the cargo having been broken in any part of the vessel. In the district court, the vessel and cargo were condemned, and from this sentence of condemnation an appeal was taken to this court.

MARSHALL, Circuit Justice. Much of the testimony found in the record, has been objected to, and to these objections, the first attention of the court has been directed. The depositions of Lewis Gordon and John York, the persons on whose information the seizure was made, were taken de bene esse, and are offered as evidence. Two objections are made to their being read: 1st. That it does not appear, that they might not have been produced in the district court. 2d. That they are interested, and, therefore, incompetent witnesses.

According to the judicial act,[2] a deposition taken de bene esse cannot be read at the trial, unless it appear to the court, that the witness is dead, or has removed out of the United States, or to a greater distance from the place of trial, than one hundred miles, or that he is unable to attend the court. No one of these requisites appear on the record to have been complied with. But, it is said by the attorney for the United States, very correctly, that if a deposition be read without objection, all objections to it are understood to be waived, and if particular exceptions are taken, all others are waived. To

2 See the judicial act of 1789. 1 Story, Laws, c. 20, §§ 30, 64 [1 Stat. 88]. "And if an appeal be had, such testimony" (depositions taken de bene esse, &c.) "may be used on the trial of the same, if it shall appear to the satisfaction of the court, which shall try the appeal, that the witnesses are then dead, or gone out of the United States, or to a greater distance than as aforesaid." (viz. one hundred miles,) "from the place where the court is sitting: or, that by reason of age, sickness, bodily infirmity, or imprisonment, they are unable to travel and appear at court: but not otherwise. And, unless the same shall be made to appear on the trial of any cause, with respect to witnesses, whose depositions may have been taken therein, such depositions shall not be admitted, or used in the cause."

these depositions, he insists, a particular objection was made in the district court, which is not valid. The objection is, "that the deposition was not taken and returned according to law." I must understand this objection as being, that that deposition is not taken and returned, according to law, as a deposition in chief. It does not appear, that the attorney for the United States, offered to prove those circumstances, which would entitle him to read it, as a deposition taken de bene esse. This he ought to have done, when the objection was taken to it, as a deposition in chief. Although the attorney for the claimants might have explained himself more fully, he was not bound so to do; and the party offering the deposition, was bound to show, that it was admissible. Even if this reasoning were incorrect, the certificate of the magistrate is insufficient. That is, that the deposition was taken, because the witness was a transient person. The deposition of John York was also objected to, because, "it did not appear to have been duly taken, according to the act of congress." This objection was overruled, because notice was given to the persons in possession of the property. This reason is certainly sufficient for overruling the objection, if taken to it as a deposition de bene esse. But if offered, unaccompanied by the evidence, which would justify its being read as a deposition de bene esse, it must be supported as a deposition, taken in chief, or it cannot be read. I think it not improbable, that the objections on the part of the claimant were understood to be made to the regularity of the depositions, as taken de bene esse, and that the fact of the witnesses having left the United States, or having removed to a distance of more than one hundred miles from the place of trial, was neither controverted, nor controvertible. But I deem it proper, in cases where depositions are taken under the act of congress, that the requisition of the act should be observed, and should appear to have been observed.

On the part of the United States, it is contended, that so far as respects the deposition of York, these requisites are dispensed with, by the appearance of the attorney of the claimants, under an express declaration, that he waived all objections to the proceedings. But I understand this general waiver, as extending to the deposition, in the character in which it was intended to be taken, not as giving it a new character, not intended by the party taking it. It was not taken under a commission, issued by the court, and is, consequently, taken de bene esse. The waiver of all objection to the proceeding, therefore, is a waiver of objection to the deposition, as one de bene esse, and cannot be understood to make it a deposition in chief.

The objection to the competency of these witnesses, is also entitled to serious consideration. The law certainly is, that the witness must be competent, when his testimony is given, and if he be not then competent, his testimony is inadmissible. If these witnesses were competent, it must be, because the very act of giving their depositions amounted to a release of their interest. Is this so? Had the depositions not been offered at the trial, but been shown to defeat a claim to their share of the forfeiture, would the attempt have succeeded? Had the depositions been rejected for any cause whatever, could they have extinguished the rights of the informers? I am not prepared to answer these questions in the affirmative. The language of the law would seem to justify these doubts.[3] If any person, entitled to a share of the forfeiture, "shall be necessary as a witness on the trial," says the act, "such person may be a witness upon the said trial," &c. Who is to judge of this necessity? Certainly not the collector. It is not for him to oust the informer for his own benefit. Then the court must judge of this necessity, and must judge of it, after hearing the other testimony. Such person "may be a witness on the trial." This language, I think, is not applicable to a deposition, taken before the trial. Gordon and York were not witnesses at the trial. They were witnesses before the trial, at the time when these depositions were taken by a magistrate. The act of congress does not speak of depositions, and it seems to me, that such persons can be rendered competent to give depositions, only by releasing their interest.

On both grounds, therefore, I think these depositions inadmissible. Indeed their testimony was either rejected or disregarded in the district court.

The direct testimony of the informers being discarded, the case turns on the other proofs in the cause. The act under which this seizure was made, declares that "in actions, suits, or informations to be brought, where any seizure shall be made pursuant to this act, if the property be claimed by any person, in every such case the onus probandi shall be upon such claimant." See 1 Story, Laws, c. 128, § 71, p. 633 [1 Stat. 678, c. 22]. In this case, then, the United States are not required to establish guilt, but the claimants must prove innocence. It is not the duty of the judge to justify the legislature, but surely, if, in any case, such a legislative provision be proper, it is in this. The fact is generally premeditated, and is perpetrated under all the precautions and in all the secrecy

---

[3] "If any officer, or other person, entitled to a part or share of any of the fines, penalties, or forfeitures, incurred in virtue of this act, shall be necessary as a witness, on the trial, for such fine, penalty, or forfeiture, such officer, or other person, may be a witness upon the said trial; but in such case he shall not receive, &c., any part or share of the said fine, &c., and the part, or share, to which he otherwise would have been entitled, shall revert to the United States." Act 1799, c. 128, § 91; 1 Story, Laws, 656 [1 Stat. 697].

which ingenuity can suggest, and the means of proving innocence, at least, to a reasonable extent, which is all that can be required, are in possession of the accused. In such a case, he may, without a violation of principle, be required to prove his innocence. In such a case, the absence of testimony, clearly in the power of the claimants, if not supplied by other equivalent testimony, must be fatal. It is impossible to smuggle so large a part of a cargo, as is charged to have been smuggled in this case, without the knowledge of the master and crew. Consequently, their testimony against the fact, if believed, would be nearly conclusive. Why is it not produced? The master, being himself liable to a fine under one of the charges in this libel, was perhaps not admissible as a witness; but to the crew, no objection existed. Why were they not examined? If they were unattainable, this fact ought to have been shown, and might have excused their non-production. The deposition of one of them only was offered, and his was taken so irregularly, as to be rejected. No attempt appears to have been made to take it again, or to take the depositions of other mariners. The documentary papers which usually accompany a cargo, and show its amount, are not produced. There is no testimony to prove, and no reason to believe, that the thirty-four puncheons of rum, and twenty barrels of limes, mentioned in the paper called a report and manifest, if we add the barrel of sugar, and of coffee found on board, and not included in the paper, constituted a full cargo for the vessel: nor is there any testimony, of any description, to show that she sailed with less than a full cargo.

To the absence of important testimony in the power of the claimants, is to be added, the testimony on the part of the United States. The mate of the revenue cutter found a lighter by the side of the vessel, the use of which, it is fair to presume, was to receive goods from her, although no permit had been granted. I say none was granted, because none is produced; nor is any circumstance proved, to create a presumption that one was granted. The arrangement of the cargo forms a strong presumption, that a part of it had been taken out. A large vacancy was found in the place which would have been filled in preference; and the cargo, which did not appear to have been moved, was so disposed, that the vessel could not have been navigated. No evidence was offered to do away these causes of suspicion. I do not term the claims evidence, although they are sworn to, because the law does not allow to the affidavit made to them the dignity of testimony. If they amount to any thing, it is to no more, if I may use the phrase of Lord Coke, than "the exclusion of a conclusion."

Such are the circumstances under which this case appeared in the district court. The judge of that court was, I think very properly, of opinion, that they do not establish the innocence of the transaction.

In this court, the depositions of Robert Pitts, George P. Barnes, and Wm. Pitts, are offered. To the reading of these depositions, the attorney for the United States objects, because, they are taken de bene esse, and it does not appear, that the two Pitts have gone out of the United States, or to a greater distance from this place than one hundred miles. This objection is, undoubtedly, conclusive; but as I have no doubt of the fact, I should allow the counsel for the claimants now to prove it, if these depositions would alter the case. I shall, therefore, consider them as if they were admitted. They are intended to meet the testimony of Butler, the officer of the revenue cutter, and to disprove the strong circumstances stated by him.

Before examining the testimony particularly, I will notice some general circumstances attending it, which seem to me to be worthy of observation. The testimony of Butler was in the cause, long before it was tried. Why was not this explanatory or conflicting evidence offered in the district court? It must have been within the knowledge of the claimants; why was it not taken? Why have they now taken it ex-parte? If it be true that the law authorizes this proceeding, it is not less true, that testimony, acquired under such circumstances, ought to be critically examined, and not carried beyond the plain meaning of the words of the witness; that material omissions justify the conclusion, that the facts omitted to be noticed, could not be noticed satisfactorily. With these observations, I shall examine these depositions. Robert Pitts states, that he was on board of the vessel when she was seized; that they had to move the hogsheads out of the hatchway to get at the cargo, and there was no appearance of any thing having been moved when he went on board. He does not say how many hogsheads were removed. Two hogsheads were on the deck and one on the slings, according to the testimony of Butler, who also says, that appearances indicated the recent removal of three hogsheads. When the witness says, there was no appearance of any having been moved, he states his own conclusion, which may have been drawn from the appearance of the hogsheads he saw. He does not say, that there was not a large vacancy in the centre of the vessel, nor that the disposition of the cargo was compatible with the navigation of the vessel. George P. Barnes has, at least, sworn carelessly in saying, that he went on board the vessel immediately on her arrival. He says, he did not discover any particular deficiency of cargo midships of said schooner, nor that there appeared to be any particular breakage of the cargo in the midships. This testimony is entirely negative, and instead of stating facts from which his conclusions

are drawn, states the conclusion of the witness. He does not say that the midships were full; that the large vacancy, described by Butler, did not exist. He does not say that the hogsheads were there; but that no particular breakage of the cargo appeared. He may not have considered this vacancy, if he observed it, as evidence of the breakage of the cargo; and if he did not so consider it, the vacancy may have made no impression on him. William Pitts says, that the floor of the schooner, from main to foremast, was covered, when she was seized, with hogsheads of rum and barrels of limes, and that there was no appearance of the cargo having been broken in any part. This testimony is certainly more explicit than any other. Had it been taken in the district court, or were any satisfactory reasons assigned for its not having been taken; or had an opportunity been given to cross-examine the witness, I will not say, that his testimony would have outweighed the conflicting and more explicit testimony of Butler; but I will say, that it would have had much more influence on my mind than it now has.

I come now to consider the second charge in the libel, the omission to make the report required by law. The claimants contend that the allegation of this offence in the libel is too defective to sustain a sentence of condemnation, whatever the testimony may be. My opinion on this point depends on the construction of the act of congress. If, by that act, the rum is forfeited for the omission of any thing required, although the report may be perfect so far as respects the rum, then I rather think the libel is not so totally insufficient as to be incapable of sustaining the sentence. It alleges, in substance, that such a report as is required by the act, was not made. But if the forfeiture of the rum depends on some omission respecting that article, then I presume the attorney for the United States, would not hazard an argument in support of this count in the libel. Act 1799, c. 128, § 30 [1 Story. Laws, 598; 1 Stat. 649, c. 22]. On the best consideration I can give to this section of the act of congress, I am of opinion that the rum is not forfeited, unless something respecting that article be omitted in the report. The act requires that a certain report shall be made, and does not forfeit the cargo, if the report be not made in the form prescribed, but the rum which is omitted. If no rum be omitted, the article to be forfeited, does not exist. Let us vary the phraseology and read it thus, "On pain of five hundred dollars, and the article so omitted." All, I presume, will admit, that only so much of the cargo as was omitted, would be forfeited, and that it would be indispensable to the validity of the libel, that it should specify the omitted article. When, instead of saying that the omitted article shall be forfeited, the law says that

the omitted rum shall be forfeited. I construe the law as equally requiring, to produce the forfeiture, that rum should be omitted, and consequently that the omission should be charged in the libel.

The following decree was rendered, reversing in part the sentence of the district court, and giving the attorney for the United States leave to amend his libel.

"This cause came on to be heard on the transcript of the record of the district court, and on the depositions taken in this court, and was argued by counsel. On consideration whereof, this court is of opinion, that there is error in so much of the sentence of the district court, as condemns the foreign distilled spirits therein mentioned, it being the opinion of this court, that the libel is insufficient to sustain that part of the sentence: It is, therefore, the opinion of this court, that so much of the sentence of the district court as condemns the foreign distilled spirits on board the Thomas & Henry, be reversed and annulled. And on the motion of the attorney for the United States, leave is given him to amend his libel, and the cause is retained for further proceedings."